■ In the Matter of VINCENT TREROTOLA, as Trustee of Local 858 Off-Track Betting, Professional Clerical and Wagering Employees, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, et al., Respondents-Appellants, v NEW YORK CITY OFF-TRACK BETTING CORPORATION et al., Appellants-Respondents. — Judgment of the Supreme Court, New York County (Freedman, J.) entered January 21, 1981, granting petitioners' application to the extent of enjoining respondents from continuing the two separate pay categories for Branch Managers I and II and the two separate pay categories for Shift Managers I and II and directing the establishment of a single pay scale for the respective categories reversed, on the law and the facts, without costs, and the petition dismissed. Petitioners are the union representing the professional, clerical and wagering employees of the Off-Track Betting Corporation (OTB), the respondent, and individual employees of OTB who are members of the union. OTB was created in 1970 as a public corporation (L 1970, ch 144, § 1, as amd). Its purpose was to establish, operate and conduct a system of off-track pari-mutuel betting on horse races. Subdivision 1 of section 76 of the New York City Off-Track Betting Corporation Law (L 1970, ch 144, § 1) requires that OTB "shall administer its personnel pursuant to the civil service law * * * class specifications and personnel orders of the New York city department of personnel and civil service commission". At that time, the regulations governing civil service employees of the city were embodied in the alternative career and salary plan. This plan has been supplemented by the collective bargaining agreements negotiated between unions representing city employees and the city. Neither the plan, nor the collective bargaining agreements require equal pay for equal work. Since, as our brother Lupiano makes clear, section 115 of the Civil

Service Law is inapplicable, there is no basis for granting petitioners the relief sought by them. When the operation of OTB first commenced, each job classification had ascribed to it the specific duties to be performed by the holders of the job titles. Largely through the process of collective bargaining these specific duties were eliminated and job classifications were consolidated. Because of this job consolidation and elimination of specific duties, wage disparities came into being among employees purportedly performing many of the same job tasks. It is the contention of the union that the duties now performed by Branch Manager I and Branch Manager II are largely the same, and hence, the holders of these job titles are entitled to equal pay. Similarly, it contends that there is no distinction of substance between the duties of those holding the titles of Shift Manager I and Shift Manager II. Hence, asserts the union, they too are entitled to equal pay. Having effected the consolidation of job titles and eliminated the duties attached to job titles, largely through the process of collective bargaining, the union now seeks to use the court to effect an equalization of wage scales. The effect will be to accord to those in the lower wage brackets a windfall which either was not bargained for or could not be achieved at the bargaining table; or to reduce the wages of those in the higher wage brackets to parity with those in the lower wage bracket, or to effect some compromise between the two. That wage scale is the sole issue in controversy between the parties is evident not only from the briefs of the parties but from the notices of appeal filed by each of them. Petitioners expressly limit their appeal to so much of Special Term's order as omits to establish a single wage scale for Branch Managers I and II and Shift Managers I and II and to fix that wage at "the highest wage paid by respondents [OTB] to shift managers and branch managers respectively" and for back pay. While OTB appeals from the entire judgment it specifically noted that it "adjudged that the respondents are enjoined from continuing the two separate pay categories for branch managers in the title Branch Office Manager, and the two separate pay categories for shift managers in the title Branch Office Manager, and are directed to establish one pay category for branch managers and one pay category for shift managers". Thus, contrary to the assertion of our dissenting brother, there is here involved no issue of administration. The quarrel is a naked endeavor to impose upon OTB, through the courts, a wage scale upon which there was no agreement during the collective bargaining process. Prudence and wisdom suggest that in order to counter the possibility of employee disaffection and for other reasons, a method be devised through collective bargaining to either abolish the job classifications objected to by creating a single classification of branch manager and a single classification of shift manager, or, in the alternative, clearly to differentiate between the duties to be performed by Branch Manager I and Branch Manager II and between Shift Manager I and Shift Manager II. However, we think it inappropriate for the court to interject itself at this time into what is, in reality, an ongoing collective bargaining process and to accord to one side or the other a benefit which either it did not seek or could not obtain in the bargaining process. Concur — Kupferman, J. P., Markewich and Bloom, JJ.

Lupiano, J., dissents in part in a memorandum as follows: It is clear on this record that respondents have established a managerial class of positions entitled "Branch Office Manager" for OTB (the New York City Off-Track Betting Corporation) with two main assignment levels — (a) those who manage and are responsible for the *total* operations of a branch office and (b) those who manage a branch office on a *shift* or alternate day schedule. These two main assignment levels were respectively called branch manager and shift manager. There was promulgated a salary plan effective January 1, 1972, for

these two assignment levels based upon criteria, such as, the size of the branch office, management and cash handling *experience* and responsibilities, and educational background. The plan provided for three levels of branch managers and two levels of shift managers at varying salary scales. The entrance level for shift manager was Shift Manager II. After three months in training and experience, a Shift Manager II could aspire to the high salary level of Shift Manager I. The promotion was specifically made *not automatic*. The entrance level for branch manager was Branch Manager III. Demonstrating noted accomplishments at this level, a Branch Manager III could aspire to be a Branch Manager II whose responsibility extended to a branch handling from $30,000 to $50,000 per day. Candidates for the highest level — Branch Manager I could come from the ranks or be recruited from outside the corporation. On or about September 28, 1972, a directive was promulgated wherein much of the criteria heretofore used to determine the salary levels of the branch and shift managers, such as amount of handle, complexity of or size of the branch, was no longer to be taken into consideration. Four levels of managerial personnel for a branch office were established, to wit the entry level of Shift Manager II (trainee) wherein the "trainee should remain at [this salary level] for a minimum of 3 months and a maximum of 6 months" the higher salary level of Shift Manager I which "salary would be in effect for *all* shift managers regardless of * * * handle * * * complexity of branch * * * location; when (and if) they have successfully completed their training period" the entry level of Branch Office Manager II wherein a "newly promoted branch manager would be paid at (a rate $1,500 higher than that of Shift Manager I) until he/she has successfully completed a probationary period of no less than 3 months or no more than 6 months" and finally the highest level — Branch Office Manager I with the highest salary level which "would be in effect for *all* branch managers regardless of * * * handle * * * complexity of branch * * * location; when (and if) they have successfully completed their probationary period" (emphasis supplied). It appears from the aforesaid and also from the procedural memorandum of Mr. John J. Bird dated December 13, 1972, that those successfully completing their probationary periods at the level positions of Shift Manager II (trainee) or Branch Manager II would succeed within three to six months of that probationary period to the higher salary level. The retention of an experience factor as a criterion in determining the salary differential, i.e., the successful completion of a probationary period at the entry levels of Shift Manager II (trainee) and of Branch Manager II has a rational basis and is not arbitrary or capricious. Petitioner's reliance on section 115 of the Civil Service Law is misplaced. Said section which provides that it is "the policy of the state to provide equal pay for equal work," " 'is a mere statement of general policy applicable to all Civil Service employees. It does not contain, however, a mandatory direction that such principle must be applied in all cases under any and all conditions' " (*Matter of Goldberg v Beame,* 22 AD2d 520, 522). Further, such provision is applicable only to State employees and is not applicable to city employees (*Alesi v Procaccino,* 47 AD2d 887; *Green v Bala,* 57 AD2d 1041). The resolution of the Board of Estimate in adopting the first pay plan states that it is the purpose of the resolution to provide fair and *comparable* pay for comparable work. Again we are confronted by a policy statement which is patently not transgressed by the rational basis underlying the branch office manager promotional sequence and related salary differentials commencing with Shift Manager II (trainee) and culminating in Branch Manager I. However, the record discloses an apparently unrebutted affidavit of Ray Hilliard sworn to on March 18, 1980, wherein he unequivocally states that "all shift managers currently employed by OTB have served in that position at

least one year. There are no probationary shift managers at the present time. Branch managers employed by OTB in February, 1979 are nonprobationary employees at the present time * * * The rate of pay [for branch officer manager positions] does not increase at the end of the probationary period." Thus, it appears that *all or many* of the encumbents in the position or with the salary equivalent of Shift Manager II or Branch Manager II may be entitled to the higher position or salary equivalent of Shift Manager I or Branch Manager I. In essence, the issue is not whether the classification and salary scales promulgated by respondents are arbitrary and capricious, but whether in administering such classification and salary scales, respondents have acted arbitrarily and capriciously. This critical issue and the allegations of petitioners that OTB has failed to "place its pay categories *in compliance* with its job classification scheme" (emphasis supplied) have not yet been determined and the matter should be remanded for a full hearing to develop the facts and the law. Although petitioners seek relief pursuant to CPLR article 78, in this instance article 78 relief could well be inadequate and thus inappropriate. Petitioners seek more than just a review of a single determination of respondents; they seek review of a continuing policy of the respondents in purportedly retaining personnel in the job classification of Shift Manager II or Branch Manager II with the equivalent salary, indefinitely, without due observance of their own classification scheme requirements as to promotional sequence. Since they seek more than may be permitted under an article 78 proceeding, this proceeding should be converted to an action for a declaratory judgment (CPLR 103, subd [c]). (See *Matter of Zuckerman v Board of Educ.*, 44 NY2d 336, 343-344.) This procedure (converting the article 78 proceeding to an action for declaratory judgment) is warranted by virtue of the allegations of the petition as amplified by the affidavits in support of the petition contained in the record herein and the modern attitudes toward formal and nonprejudicial procedural and technical defects (see *Matter of O'Shea,* 28 AD2d 977). CPLR 104 declares that "(t)he civil practice law and rules shall be liberally construed to secure the just, speedy and inexpensive determination of every civil judicial proceeding". The petition is brought not just by the union, but by three employees of OTB, individually, on their own behalf and on behalf of all others similarly situated — to wit Bart Archin, Anthony Auteri, and John Robertson. The reality underlying the petition is not simply a collective bargaining issue or a union-management issue, but is, as already indicated, a policy issue related to the manner in which OTB administers its otherwise validly promulgated classification and salary scales, an issue integral to the contract of employment. Accordingly, it is concluded that Special Term erred in enjoining respondents from continuing the two separate pay categories for branch managers and for shift managers in the title branch office manager and directing them to establish one pay category for branch managers and one pay category for shift managers. However, as already indicated, a grave issue is presented as to whether the respondents are properly administering their otherwise validly promulgated classification and salary scale and the matter should be remanded to Special Term for further proceedings in accordance with the observations herein. In light of the aforesaid and the nature of the relief specifically requested by the petition, there is no need to confront any issue as to retroactivity of salary increases which might arise by virtue of a finding that certain employees of OTB are entitled to increases in salary. The key distinction between my view of this matter and the majority's perception is that the latter perceive the litigation to be solely an endeavor by the union to use the court to effect an equalization of wage scales, not otherwise warranted, and that such endeavor must be relegated to the collective bargaining process,

while I perceive the critical issue to be the propriety of the policy utilized by respondents in *administering* the classification and salary scales, i.e., whether respondents have arbitrarily and without legal justification refused to promote employees as required by respondents' own classification scale and related regulations, which scale is an integral incident of the employment contract. To further simplify, the classification scale presently in effect appears to envision the job position of Shift Manager II (trainee) as a position with a term of three to six months at the end of which period, upon successful completion of this training period, the employee would automatically be promoted to the higher position of Shift Manager I with its attendant higher salary. Similarly, the job position of Branch Office Manager II is envisioned as a probationary period of three to six months at the end of which period, upon successful completion, the employee is automatically promoted to Branch Office Manager I with its attendant higher salary. It is urged by petitioners on this record that respondents have adopted a policy of ignoring the promotional sequence outlined above, without just cause, so as to effectuate a savings by payment of the lesser salaries (those attributed to the entry probationary levels of Shift Manager II and Branch Office Manager II), despite the fact that the incumbents have successfully completed their probationary terms and are entitled under respondents' classification plan to the next higher position with its attendant higher salary. This is not simply a collective bargaining issue, but an issue inextricably intertwined with the employment contract and subject to article 78 relief, and in this instance, more appropriately the subject of declaratory relief. The majority do not address this aspect of the record. Accordingly, the judgment, Supreme Court, New York County (Freedman, J.), entered January 21, 1981, in favor of petitioners enjoining the respondent the New York City Off-Track Betting Corporation from continuing to maintain two separate pay categories for branch office managers assigned to be in charge of a branch and two additional separate pay categories for branch office managers assigned to be in charge of a shift and directing respondents to establish one pay category of each position, should be reversed, on the law, without costs and disbursements, proceeding pursuant to CPLR article 78 converted into a declaratory judgment action and the matter remanded to Special Term for a determination as to the policy utilized by respondents in administering the classification and salary scales promulgated by them, that is whether in administering (as distinct from promulgating) such classification and salary scales, respondents have acted arbitrarily and capriciously.